UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 15-2573 (DSD/TNL)

Janice White,

        Plaintiff,

v.                                                   **ORDER**

Dustin Stenglein, Armando Sanchez,
and Scott Marks, individually and
in their capacities as Minnetonka
Police Officers, and the City
of Minnetonka,

        Defendants.

    Rockford R. Chrastil, Esq. and Jonathan G. Steinberg, Esq., Chrastil and Steinberg, PLLP, 412 South Fourth Street, Suite 1155, P.O. Box 15085, Minneapolis, MN 55415, counsel for plaintiff.

    Jason Hiveley, Esq. and Nathan C. Midolo, Esq., Iverson Reuvers Condon, 9321 Ensign Avenue South, Bloomington, MN 55438, counsel for defendants.

    This matter is before the court upon the motion for summary judgment by defendants Dustin Stenglein, Armando Sanchez, and Scott Marks, all officers of the Minnetonka Police Department, and the City of Minnetonka. Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the motion.

**BACKGROUND**

This civil rights dispute arises out of plaintiff Janice White's arrest for disorderly conduct. On June 3, 2014, an employee of the Ridgedale Mall Cache store contacted mall security to report that a female customer, who allegedly paid for merchandise with counterfeit money on a previous occasion, had returned to the store. Stenglein Dep. at 26:6-20; Stenglein Aff. Ex. 1 at 1. Mall security, in turn, called the Minnetonka Police Department for assistance. Stenglein Aff. Ex. 1 at 1. Officer Stenglein responded to the call. Id. En route to Cache, Stenglein learned that the customer - later identified as White - had left Cache and was at the Jamba Juice in the mall. Id. Stenglein proceeded to Jamba Juice but arrived after White had gone. Id. Stenglein visually examined the $20 bill White used at Jamba Juice and determined that it appeared to be valid. Id. Stenglein asked a mall security officer to test the bill with a counterfeit detector to confirm. Id.

Stenglein then went to Cache and interviewed Brian Myers, the employee who made the report. Id. Myers explained that White, who frequently shopped in the store, had used a counterfeit $20 bill to pay for merchandise on a prior occasion. Id. Myers recalled that White paid for the merchandise in cash with $20 bills, which was unusual. Id. After the purchase, the store manager informed Myers that one of the bills was counterfeit. Id. The manager instructed

2

employees to contact mall security if White returned to the store. Stenglein Dep. at 26:14-20.

After speaking with Myers, Stenglein attempted to catch up with White while she was still in the mall, but was unable to do so. Stenglein Aff. Ex. 1 at 1. He then requested assistance from other officers to locate White. Id. Officer Sanchez responded to the call and pulled White over in her vehicle in the mall parking lot.[1] Id. Sanchez calmly asked White why she was at the mall and told her that he was trying to figure out what happened at Cache. Stenglein Aff. Ex. 4 at 3:18:22-50. He then asked her for her driver's license. Id. at 3:18:55. White responded by screaming at Sanchez. Id. at 3:18:55-3:19:30. Sanchez remained calm and explained that a Cache employee reported that she had used a counterfeit bill to pay for merchandise. Id. at 3:19:58-3:20:10. White became more agitated and screamed "that's a lie." Id. at 3:20:05-10. Sanchez again requested White's driver's license and she again failed to comply. Stenglein Aff. Ex. 2 at 1. Sanchez then called for back up. Id. Ex. 4 at 3:20:09.

While waiting for other officers to arrive, Sanchez repeated that he was trying to find out what happened at Cache and that he just needed to speak with her. Id. at 3:20:52-3:21:05. White

---

[1] The entirety of White's interaction with the police from this point forward was captured on Officer Sanchez's squad car camera. White does not dispute the accuracy of the squad car video, and the court will rely on it for purposes of this motion.

3

continued to scream. Id. at 3:20:52-3:21:41. Sanchez said that an officer was coming to the scene to explain the situation. Id. at 3:21:30-40. After officers Marks and Stenglein arrived on the scene, Sanchez asked White to exit her vehicle and for her driver's license. Id. at 3:22:02. White again failed to comply. Id. at 3:22:02-22. Stenglein opened White's door and she exited the vehicle screaming "do not touch me!" Id. at 3:22:30-37. The officers attempted to calm her down without success. See id. at 3:22:32-50.

Stenglein told White that he would arrest her if she did not calm down. Id. at 3:22:46. In response, White backed away from the officers and screamed "What the hell are you talking about?" and "You calm down!" Id. at 3:22:46-55. The officers then arrested White and placed her in handcuffs. Id. at 3:22:53-3:23:10. Stenglein once again explained the situation to White. Id. at 3:23:35-24:30. White requested that she be allowed to sit on the curb and Marks assisted her in doing so. Id. at 3:25:35. White yelled "You're a man...do you abuse your wife? Don't do that to me!" and screamed "I'm out of control!"[2] Id. at 3:25:42-26:06.

Stenglein, meanwhile, confirmed that the $20 bill White used at Jamba Juice was valid. He also tested a $20 bill from White's

---

[2] The parties dispute whether a crowd gathered during White's arrest. The squad car video does not show the surrounding area and parties have differing accounts. Whether a crowd had gathered, however, is immaterial given the other undisputed evidence.

wallet and determined that it too was valid. Stenglein Dep. at 78:16-81:11; Steglein Aff. Ex 4 at 3:28:00-3:28:10. White then stood up from the curb and attempted to walk away, saying that she wanted to go back into the mall to resolve the matter. Id. at 3:29:00-10. Sanchez blocked her path and Marks held onto her arm to stop her from leaving. Id. at 3:29:00-30. Neither officer restrained White aggressively, but White complained that Marks twisted her arm. Id. at 3:29:24-30. Officers ultimately released White seventeen minutes after Sanchez pulled her over. Id. at 3:34:10.

Throughout the incident White maintained her innocence. Id. at 3:29:46-35:39. She acknowledged, however, that she "freaked out" when Sanchez pulled her over. Id. at 3:29:46-35:39. The city attorney ultimately declined to file charges against White for disorderly conduct. Stenglein Aff. Ex. 7. There is no indication in the record that White was ever charged with any crime relating to the counterfeit money allegations.

On May 28, 2015, White filed this suit alleging illegal search and seizure and failure to prevent a constitutional violation, in violation of 42 U.S.C. § 1983; race discrimination, in violation of the Minnesota Human Rights Act; and battery, assault, false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress, in violation of Minnesota law. Defendants now move for summary judgment.

**DISCUSSION**

## I.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists — or cannot exist — about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

## II. Section 1983 Claims

Section 1983 is not an independent source of rights, and a successful claim must demonstrate a deprivation of a specific right, privilege, or immunity. Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). In this case, White alleges that her constitutional rights were violated when the officers (1) stopped her without reasonable articulable suspicion; (2) arrested her without probable cause; (3) unlawfully searched her wallet;[3] (4) used excessive force; and (5) failed to prevent each other from violating her constitutional rights.

The officers argue that they are immune from suit under the doctrine of qualified immunity. "[Q]ualified immunity protects [law enforcement] officers from personal liability under § 1983 insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." Baribeau v. City of Minneapolis, 596 F.3d 465, 473 (8th Cir. 2010) (citation and internal quotation marks omitted). The court applies the doctrine of qualified immunity in a manner that "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005) (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

---

[3] White also alleges that the officers unlawfully searched her car, but there is no evidence that any such search occurred.

To determine whether the officers are entitled to qualified immunity, the court first considers whether the alleged facts demonstrate that their conduct violated a constitutional right and, if so, whether the right claimed was clearly established at the time of the alleged injury. Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009). "If the answer to either question is no," then the officers are entitled to qualified immunity. Doe v. Flaherty, 623 F.3d 577, 583 (8th Cir. 2010).

**A.   Unlawful Seizure**

White argues that the officers violated her Fourth Amendment rights by detaining her without having a reasonable suspicion of criminal activity and arresting her without arguable probable cause.

**1.   Terry Stop**

Police may detain criminal suspects for investigation if officers have a "reasonable suspicion supported by articulable facts that criminal activity may be afoot." United States v. Blackmon, 662 F.3d 981, 985 (8th Cir. 2011) (citing Terry v. Ohio, 392 U.S. 1 (1968)). "This determination is based upon the totality of the circumstances." Williams v. Decker, 767 F.3d 734, 739 (8th Cir. 2014). "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417–18 (1981).

8

"Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Carpenter, 462 F.3d 981, 986 (8th Cir. 2006) (citation omitted).

White challenges the stop, arguing that Myers did not provide sufficiently detailed information to support a reasonable articulable suspicion that she was involved in criminal activity. The court disagrees. Stenglein responded to the call from mall security regarding the possible passing of counterfeit bills. He followed up by taking to Myers, who unequivocally identified White as a regular customer who was recently suspected of passing counterfeit money. Based on this specific information, it was reasonable for officers to stop White to further investigate the matter. As a result, the officers are entitled to qualified immunity and dismissal of White's claim under Terry is warranted.

### 2. Arrest

White also argues that she was unlawfully arrested without probable cause. Where, as here, the claim is for damages, qualified immunity attaches if the officers "had arguable probable cause to make the arrest." Galarnyk v. Fraser, 687 F.3d 1070, 1074 (8th Cir. 2012) (citations and internal quotation marks omitted). "An officer has probable cause to make a warrantless arrest when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the

9

defendant has committed or is committing an offense.'" Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011) (quoting Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 816 (8th Cir. 2010)). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based on probable cause if the mistake is objectively reasonable." Peterson v. Kopp, 754 F.3d 594, 598 (8th Cir. 2014). "Though the probable-cause standard allows room for reasonable mistakes by a reasonable person, the qualified-immunity standard protect[s] all but the plainly incompetent or those who knowingly violate the law." Greenman v. Jessen, 787 F.3d 882, 888 (8th Cir. 2015) (citations and internal quotation marks omitted).

Under Minnesota law, disorderly conduct includes "offensive, obscene, abusive, boisterous, or noisy conduct or ... offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others." Minn. Stat. § 609.72, subdiv. 1(3). Given White's sustained loud and erratic behavior, as captured in the squad car video, the officers had a sufficient basis to believe that she was guilty of engaging in disorderly conduct. Indeed, White's behavior was such that it would reasonably, and did, cause alarm among the officers.

White argues that the officers did not have arguable probable cause to arrest her for disorderly conduct because it is undisputed

that she did not utter "fighting words."[4] Although White is correct that only expressive language or speech that amounts to "fighting words" is proscribed, the speech here was content neutral. See In re Welfare of T.L.S., 713 N.W.2d 877, 881 (Minn. Ct. App. 2006) (emphasis in original) ("Although the disorderly conduct statute prohibits only 'fighting words' as applied to speech content, the disorderly shouting of otherwise protected speech or engaging in other 'boisterous or noisy conduct' may still trigger punishment without offending the First Amendment."). Because the officers reacted to the "manner of [White's] delivery of speech," rather than its content, they had arguable probable cause to arrest her for disorderly conduct. Id. To the extent the there is any ambiguity with respect to what the disorderly conduct statute prohibits, the law is not sufficiently clear to preclude application of qualified immunity. See Howard, 570 F.3d at 988 (recognizing that the right at issue must have been "clearly established" at the time of the alleged injury).

Even in the absence of arguable probable cause, the officers were also entitled to restrain White in order to maintain the status quo and ensure their safety pending the completion of the Terry stop. See El-Ghazzawy v. Berthiaume, 636 F.3d 452, 457 (8th Cir. 2011) (holding that it is well-established that "officers may

---

[4] "Fighting words" are words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Baribeau, 596 F.3d at 478 (citation omitted).

use handcuffs as a reasonable precaution to protect the officers' safety and maintain the status quo during the Terry stop.").

As a result, summary judgment is warranted on White's § 1983 claim for unlawful seizure.

### B.   Unlawful Search

White claims that Stenglein violated her Fourth Amendment rights when he searched through her wallet after her arrest and tested a $20 bill.  This claim is meritless.  The law is clear that a warrantless search of a wallet incident to arrest does not violate the Fourth Amendment.  See United States v. Garcia-Garza, No. 14-cr-113, 2014 WL 3748644, at *7 (D. Minn. July 30, 2014) (collecting cases).  Further, Stenglein was permitted to search the wallet and test the $20 bill as part of the valid Terry stop.  See United States v. Clay, 640 F.2d 157, 160 (8th Cir. 1981) ("An investigatory search will be found constitutionally permissible ... when supported by reasonable suspicion directed to the person to be searched....").  White cites no authority to the contrary.   As a result, summary judgment is also warranted on the § 1983 claim for unlawful search.

### C.   Excessive Force

White next claims that officers violated her Fourth Amendment rights by using excessive force.[5]  This right protects against the

---

[5]   The complaint does not specifically allege an excessive force claim, but such a claim is implicit in light of the facts alleged and will be considered.

use of excessive force in the apprehension or detention of a person. Graham v. Connor, 490 U.S. 386, 395 (1989). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009) (citations and internal quotation marks omitted). "[T]he right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Cook v. City of Bella Villa, 582 F.3d 840, 849 (8th Cir. 2009) (quoting Graham, 490 U.S. at 396).

When evaluating the reasonableness of an officer's use of force, the court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (citing Terry, 392 U.S. at 20-22). The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97; see Brown, 574 F.3d at

496.

"View[ing] the facts in the light depicted by the videotape," each of the officers acted reasonably under the circumstances. Scott v. Harris, 550 U.S. 372, 381 (2007). The video shows White screaming and behaving erratically despite the officers' many attempts to calm her down. Throughout the incident, officers remained composed and took no action that reasonably could be construed as excessive force. As a result, White's excessive force claim fails as a matter of law.

**D.   Failure to Intervene**

An officer may be liable under § 1983 for failing to intervene when another officer applies excessive force.[6] Putman v. Gerloff, 639 F.2d 415, 423-24 (8th Cir. 1981). An officer may be liable for failing to intervene if "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." Nance v. Sammis, 586 F.3d 604, 612 (8th Cir. 2009) (quoting Floyd v. City of Detroit, 518 F.3d 398, 406 (6th Cir. 2008)). Because none of the officers applied excessive force, this claim also fails.

**E.   Monell Claim**

Although unclear from the complaint and briefing, White may

---

[6] The Eighth Circuit has not recognized a duty to intervene outside the context of excessive force. Livers. v. Schenck, 700 F.3d 340, 360 (8th Cir. 2012).

14

also claim that the City of Minnetonka is liable for the officers' alleged constitutional violations. A municipality is only subject to liability under § 1983 when the plaintiff establishes that the municipality maintained a policy, custom, or practice "the implementation of which amounted to deliberate indifference to his constitutional rights." Lund v. Hennepin Cty., 427 F.3d 1123, 1125 (8th Cir. 2005) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). White neither alleges nor submits any evidence to support a finding that any such policy, custom, or practice existed. Further, a municipality cannot be held liable under § 1983 unless a municipal employee is found liable on an underlying substantive constitutional claim. Monell, 436 U.S. at 691; Abbott v. City of Crocker, 30 F.3d 995, 998 (8th Cir. 1994). Because the court determines that none of the officers violated White's constitutional rights, she also fails to establish municipal liability.

**III. MHRA Claim**

White asserts that the incident was racially motivated in violation of the Minnesota Human Rights Act. The record is devoid of any objective evidence to support such a claim. White argues that Sanchez's questioning of her evinced racial animus. The court disagrees and finds that no reasonable juror could conclude otherwise. This claim is dismissed.

**IV.  State Law Claims**

White alleges that the officers' conduct constituted battery, assault, false imprisonment, and intentional and negligent infliction of emotional distress under Minnesota law.  Defendants have moved for summary judgment on all of those claims, and White failed to challenge that aspect of defendants' motion.  Summary judgment is warranted on this basis alone.  See Graham v. Rosemount, Inc., 40 F. Supp. 2d 1093, 1101 (D. Minn. 1999) (concluding that plaintiff's failure to respond to defendants' arguments resulted in waiver of claims).

The claims fail, however, even if considered on the merits. The assault and battery claims fail because, as discussed, the officers' use of force was not excessive.  See Sang v. City of St. Paul, No. 09-455, 2010 WL 2346600, at *7 (D. Minn. June 8, 2010) ("[O]nly when a police officer uses excessive force may he be liable for battery under Minnesota law.").  White's false imprisonment claim likewise fails given that officers had arguable probable cause to arrest her.  See Anderson v. Franklin Cnty., 192 F.3d 1125, 1132 (8th Cir. 1999) (denying false imprisonment claim where officers had probable cause to arrest the plaintiff).  Finally, White has failed to establish a claim for either intentional or negligent infliction of emotional distress because she has not proven the requisite level of extreme conduct by the officers or that she suffered severe emotional distress.  See Hubbard v. United Press Int'l, Inc., 330

16

N.W.2d 428, 438–39 (Minn. 1983) (holding that intentional infliction of emotional distress requires intentional or reckless extreme and outrageous conduct that causes severe emotional distress); K.A.C. v. Benson, 527 N.W.2d 553, 557 (Minn. 1995) (holding that negligent infliction of emotional distress requires "severe emotional distress with attendant physical manifestations"). As a result, the officers are entitled to official immunity[7] on the state-law claims.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the motion for summary judgment [ECF No. 13] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 8, 2016

                                         s/David S. Doty
                                         David S. Doty, Judge
                                         United States District Court

---

[7] "Like qualified immunity, official immunity protects public officials, including police officers, from liability for state-law claims arising out of discretionary acts taken in the course of their official duties." Sang, 2010 WL 2346600, at *6.